T.C. Memo. 2007-134


UNITED STATES TAX COURT


BARRY E. MOORE AND DEBORAH E. MOORE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11002-03.                    Filed May 30, 2007.


        In 1988, Ps, Georgia residents, purchased a second
home (vacation home 1), also in Georgia, which the
family used on weekends from mid-April to Labor Day for
recreational purposes.  After Ps changed their
principal residence in 1995 or 1996, the lengthened
commute to vacation home 1 made its continued use
impractical, and, in 1999, they agreed to purchase
another vacation home (vacation home 2) closer to their
principal residence.  In 2000, Ps disposed of vacation
home 1 and acquired vacation home 2 pursuant to a
series of transactions intended to qualify as a tax-
free, like-kind exchange of those properties under sec.
1031, I.R.C.  Prompted by the need for liquidity
incident to their then-pending divorce, Ps were holding
vacation home 2 for sale at the time of trial.  Ps and
their children used both vacation homes exclusively for
recreational purposes, and Ps never rented or offered
to rent either vacation home to third parties.  One of
Ps' motives in acquiring and holding each vacation home

was the prospect of appreciation resulting in profit on the eventual sale of each property.

P wife (PW) acquired a 2-percent membership interest in a medical LLC (the LLC) upon formation of the LLC in April 1995.  In July 2000, incident to the July 28, 2000, sale of all membership interests in the LLC to a third party, the three LLC members executed a written agreement describing transfers by Dr. J, who held an 88-percent membership interest in the LLC as of Dec. 31, 1995, of 10-percent membership interests to each of the other two LLC members, PW and Dr. M (who previously held a 10-percent LLC membership interest). The agreement stated that it was "effective as of" Jan. 1, 1997.  In 1998, 1999, and 2000, the LLC made distributions to the three members consistent with a 68-20-12-percent apportionment of the LLC profits among Dr. J, Dr. M, and PW, respectively.  Ps argue that Dr. J's transfers of 10-percent membership interests to Dr. M and PW did not occur until July 2000.  R argues that the July 2000 written agreement formalized a prior oral agreement and that the effective date of those transfers was Jan. 1, 1997.

PW received both a lump-sum cash payment and a promissory note in consideration of the July 28, 2000, sale of her 12-percent LLC membership interest.  On their 2000 return, Ps reported, as long-term capital gain under the installment method of accounting, the lump-sum cash payment and the sum of the first five monthly payments due under the terms of the promissory note.  R argues that Ps elected out of the installment method with respect to the gain on the sale and that Ps are required to report the full amount of that gain in 2000.

1.  Held:  Neither vacation home 1 nor vacation home 2 was held for investment.  Therefore, Ps are not entitled to treat the disposal of the former and acquisition of the latter in 2000 as a tax-free like-kind exchange under sec. 1031, I.R.C.

2.  Held, further, PW owned a 12-percent membership interest in the LLC during the years in issue, 1999 and 2000.

3.  Held, further, Ps did not elect out of the installment method of accounting in connection with

PW's 2000 sale of her 12-percent LLC membership
interest.

Vivian D. Hoard and Patti M. Richards, for petitioners.

Michael L. Scheier and Jennifer J. Morales, for affected
person United Surgical Partners International, Inc.

Brenda M. Fitzgerald, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


HALPERN, Judge:  By notice of deficiency dated April 10,
2003 (the notice), respondent determined deficiencies in
petitioners' Federal income tax as follows:

| Year | Deficiency |
|------|-----------|
| 1999 | $96,925 |
| 2000 | 78,578 |

By the petition, petitioners assign error to respondent's
deficiency determination.  The parties have resolved certain
issues.[1]  The remaining issues for decision are whether (1)
petitioners' purported exchange of vacation properties qualifies
as a tax-free "like-kind" exchange of properties under section

---

[1]  Those issues are (1) issues settled or conceded pursuant
to the parties' stipulation of settled issues executed on May 19,
2004, and (2) issues that petitioners failed to pursue on brief,
which we treat as having been abandoned.  See Nicklaus v.
Commissioner, 117 T.C. 117, 120 n.4 (2001).  The issues that
petitioners failed to pursue are (1) whether petitioners are
required to include in income for 1999 $1,701 of interest and (2)
whether petitioner Barry E. Moore is entitled to relief from tax
liability for either 1999 or 2000 as an innocent spouse.

1031[2] (the section 1031 issue), (2) petitioner Deborah E. Moore (Ms. Moore) increased her membership interest in The Surgery Center of Georgia, LLC (the LLC) before the years in issue (1999 and 2000), as alleged by respondent, or in July 2000, as alleged by petitioners (the membership interest acquisition issue), and (3) petitioners are entitled to report Ms. Moore's gain on the sale of her membership interest in the LLC under the installment method, in accordance with section 453 (the installment method reporting issue).[3]

The notice contains certain other adjustments that are purely computational. Their resolution solely depends upon our resolution of the issues remaining in dispute.

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3] The parties also disagree regarding the application of sec. 7491(a) to this case. If applicable to a factual issue, sec. 7491(a) would cause the burden of proof on that issue to shift from petitioners to respondent. See Rule 142(a). We need not decide whether sec. 7491(a) applies herein because we resolve all factual issues upon a preponderance of the evidence. Therefore, resolution of the issues in this case does not depend upon which party bears the burden of proof. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005); see also Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), affg. T.C. Memo. 2003-212; FRGC Inv., LLC v. Commissioner, 89 Fed. Appx. 656 (9th Cir. 2004), affg. T.C. Memo. 2002-276; Brookfield Wire Co. v. Commissioner, 667 F.2d 551, 553 n.2 (1st Cir. 1981), affg. T.C. Memo. 1980-321.

Petitioners' Challenge to Respondent's Briefs

On the basis of Rule 151(b), Time for Filing Briefs, petitioners argue that we must disregard respondent's opening brief because respondent filed that brief 1 day late and did not move before the due date for an extension of time to file. Petitioners also argue that, because respondent "failed to file" an opening brief and did not seek leave of the Court to file a reply brief, he is not permitted to file a reply brief. See Rule 151(b).

Petitioners argue that respondent should have filed his opening brief no later than August 15, 2005, the last day of the 60-day period allotted by the Court for such filings at the conclusion of the trial on June 15, 2005, even though the trial transcript furnished to the parties records both the trial clerk and the Court as stating that due date to be August 16, 2005, the date upon which respondent's opening brief was actually filed.

Because the Court identified a due date one day after the close of the 60-day period allocated by the Court for the filing of opening briefs, the Court must accept some responsibility for the tardiness, if any, in respondent's filing of his opening brief. Moreover, 1 day is negligible, and we do not believe that it prejudiced petitioners in preparing their answering brief. In fact, petitioners do not allege that they were so prejudiced; they allege only that we "must strike and disregard" respondent's

brief pursuant to Rule 151.  Under the circumstances, we find it inappropriate to disregard or strike respondent's opening (or reply) brief, and we decline to do so.

FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts, with attached exhibits, is incorporated herein by this reference.

At the time the petition was filed, petitioner Barry E. Moore (Mr. Moore) resided in Elberton, Georgia, and Ms. Moore resided in Marietta, Georgia.

The Section 1031 Issue

Background

On April 15, 1988, petitioners purchased two contiguous parcels of lakefront real property, along with a mobile home located on one of those parcels, on Clark Hill Lake in Lincoln County, Georgia (the Clark Hill property).  On December 3, 1999, petitioners entered into a purchase and sale agreement wherein they agreed to purchase improved lakefront property in Forsyth County, Georgia (the Lake Lanier property).  Thereafter, during 2000, petitioners were involved in a series of transactions whereby they purported to (1) assign a 25-percent interest in the purchase and sale agreement to an escrow agent, (2) join with the escrow agent in purchasing the Lake Lanier property (75 percent acquired by petitioners, 25 percent by the escrow agent), and (3)

after buyers for the Clark Hill property had been found, through an intermediary, exchange the Clark Hill property for the escrow agent's 25-percent interest in the Lake Lanier property in a transaction intended to qualify as a deferred like-kind exchange satisfying the requirements of section 1031(a)(3) and section 1.1031(k)-1, Income Tax Regs. Respondent denies the authenticity of much of petitioners' supporting documentation and alleges that (1) the escrow agent was, in substance, acting as petitioners' agent in acquiring a 25-percent interest in the Lake Lanier property so that petitioners already owned that property before the purported like-kind exchange; i.e., there was no "exchange" of like-kind properties, and (2) petitioners otherwise failed to satisfy the requirements of section 1031(a)(3) and the regulations thereunder for a deferred like-kind exchange.

In order for petitioners to prevail on the section 1031 issue, the evidence must show that (1) the Clark Hill and Lake Lanier properties were of like kind (a matter not in dispute), (2) petitioners held both properties for investment,[4] and (3) they disposed of the former and acquired the latter in a manner that satisfied the requirements of section 1031(a)(3) and the regulations thereunder for a deferred like-kind exchange.

---

[4] Petitioners do not claim that either property satisfied the alternative definition of qualified like-kind property: "property held for productive use in a trade or business". Sec. 1031(a)(1).

Because we find that petitioners held neither property for investment, we make no findings of fact relating to the sufficiency of petitioners' attempt to satisfy the other requirements for a deferred like-kind exchange.[5]

### Petitioners' Purchase and Use of the Properties

#### The Clark Hill Property

Petitioners' decision to purchase the Clark Hill property was motivated, in part, by their familiarity with the area, both having grown up in the vicinity of Clark Hill Lake.  In addition, both their families owned property on or near Clark Hill, and Mr. Moore's father advised them that property on Clark Hill Lake had appreciated and would continue to appreciate.  Petitioners' decision to invest in real estate rather than in intangibles, such as stocks or bonds, was influenced by a prior bad experience with a financial adviser who had stolen their money.

When in 1988 they purchased the Clark Hill property, petitioners' primary residence was in Norcross, Georgia, an approximately 3-hour drive from the Clark Hill property.  In 1995 or 1996, petitioners changed their primary residence to Marietta, Georgia.  The drive from the Marietta residence to the Clark Hill property normally took between 5 and 6 hours.

---

[5]  As a result, we need not rule on respondent's objections to various documents petitioners offered.

Beginning in late March of each year during which they owned the Clark Hill property, Mr. Moore would spend a couple of weekends there getting it ready for the summer months. Then, beginning in mid to late April, petitioners' family would visit the property two and, sometimes, three weekends a month until Labor Day, when Mr. Moore closed the property for the winter. Between Labor Day and the following March, Mr. Moore would occasionally visit the property to rake leaves and perform other caretaker functions.

The mobile home located on the property was a double-wide mobile home. During their tenure, petitioners built a deck around it, built a screened-in porch on top of a portion of the deck, and installed a satellite television receiver, a new television, and a VHS recorder. They also replaced the roof and repainted the home two or three times. They installed a new washer and dryer and replaced some of the furniture (bedroom seats and beds) that had come with the home. They kept a pontoon boat on Clark Hill Lake and improved the dock they had in the lake to conform to the U.S. Army Corps of Engineers electrical requirements. During their summer stays at the Clark Hill property, petitioners and their children used the property for various recreational purposes, including relaxing on the dock, boating, and fishing.

Until they decided to acquire the Lake Lanier property in late 1999, petitioners had never advertised the Clark Hill property for sale although they had been offered money for it. Also, petitioners never rented or attempted to rent the property to others.

On their 1996-99 Federal income tax returns, petitioners listed deductions for "home mortgage interest". They did not list on those returns any deduction for investment interest, nor did they deduct any maintenance or other expenses associated with the Clark Hill property.

### The Lake Lanier Property

### Reasons for Purchase

After petitioners changed their principal residence from Norcross to Marietta, Georgia, the length of the drive to the Clark Hill property coupled with their children's increased weekend activities (in particular, their son's participation in weekend sports) made it inconvenient for the family to spend weekends at the property. As a result, they used that property less frequently and, during the 2 years before their disposition of it, they may have visited the property a total of three times. During that period, it became a chore for Mr. Moore just to maintain the property, with the result that it became rundown and had to be either renovated or disposed of.

Beginning in late 1997 or early 1998, the foregoing problems associated with the Clark Hill property caused petitioners to investigate properties on Lake Lanier, which is much closer to what was at the time petitioners' Marietta, Georgia, residence. Petitioners felt that a house on Lake Lanier would be of more use to them than the Clark Hill property. Petitioners also believed that property on Lake Lanier would appreciate more rapidly than the Clark Hill property because it was closer to the metropolitan Atlanta area. Petitioners acquired the Lake Lanier property in January 2000.

### Use of the Property

The Lake Lanier property consisted of a greater than 1.2-acre tract of land, the largest double slip dock allowable on the lake (complete with two lifts), and a house that had five screened-in porches overlooking the lake, a full party deck, a covered veranda, a great room with a stone fireplace, five bedrooms, and 4-1/2 bathrooms. At the time of purchase, the house was partially furnished, and, after purchase, petitioners completed the furnishing themselves. They installed a satellite TV system and a VHS recorder, and, before their second summer at the property, they purchased a motorboat with room for six to eight passengers.

Petitioners and their children engaged in essentially the same activities at the Lake Lanier property as they had at the

Clark Hill property.  They visited the property two weekends per month beginning in mid-March (depending on the weather) and ending around Labor Day.  In addition, the family might visit the property once or twice each winter, and Mr. Moore and his son would fish off the dock one Saturday night each month during the fall.  During the summer months, petitioners occasionally entertained visitors at the house.  Mr. Moore's maintenance activities at the Lake Lanier property were similar to, but less frequent than, his maintenance activities at the Clark Hill property.

The mortgage lender in connection with petitioners' purchase of the Lake Lanier property was SouthTrust Bank, N.A. (SouthTrust Bank).[6]  On their 2000-02 Federal income tax returns, petitioners claimed deductions for home mortgage and investment interest paid to SouthTrust Bank as follows:

| Year | Home Mortgage Interest | Investment Interest |
|------|------------------------|---------------------|
| 2000 | $36,219 | $5,647 |
| 2001 | 42,437 | 1,994 |
| 2002 | 45,766 | -- |

As in the case of the Clark Hill property, petitioners did not list on their 2000-02 returns any deductions for maintenance or other expenses associated with the Lake Lanier property.

_____

[6]  In its "Credit Offering Report" assessing the risk of various loans to Ms. Moore, including the loan to purchase the Lake Lanier property, that property, which was to serve as security for those loans, is consistently referred to as a "second residence".

Also, as in the case of the Clark Hill property, petitioners never rented or attempted to rent the Lake Lanier property, and they never offered it for sale until forced to do so by the need for liquidity in connection with the division of their assets incident to their divorce.  Both the sale and the divorce were still pending at the time of the trial.

The Membership Interest Acquisition Issue

The LLC Operating Agreement

The LLC was organized in the State of Georgia on April 19, 1995, and, as of that date, the "Operating Agreement of The Surgery Center of Georgia" (the LLC operating agreement or the agreement) became effective.  Pursuant to the agreement, the initial members of the LLC and their initial membership interests were as follows:

| Member | Percent Interest |
|---|---|
| Laser Centers of America, Inc. | 45 |
| Stephen N. Joffe, M.D. | 35 |
| Barry McKernan, M.D. | 10 |
| Hugh McLeod, M.D. | 8 |
| Deborah Moore | 2 |

At that time, Dr. Joffe was the CEO and sole shareholder of Laser Centers of America, Inc., which was designated the manager of the LLC.[7]

---

[7] On a day-to-day operational basis, however, Ms. Moore managed the LLC.

Article 8 of the LLC operating agreement governs "Allocations and Distributions".  Section 8.5, entitled "Interim Distributions", provides in pertinent part as follows:

> To the extent * * * [cash in excess of current and anticipated needs] exists, the Members * * * may make Distributions to the Members in accordance with their Membership Interests.  Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Manager.

Article 10 of the agreement is entitled "Disposition of Membership Interests".  Section 10.1 provides:  "No Membership Interest of the * * * [LLC] shall be Disposed, except as hereinafter provided in this Article 10."  Section 10.2.1, governing voluntary dispositions of membership interests, provides in pertinent part:  "Any Member who desires voluntarily to Dispose of the Membership Interest * * * owned by him in the * * * [LLC] shall give the Manager * * * written notice of his intent and the terms of such proposed Disposition."  Section 10.3 gives the LLC an overall 90-day right of first refusal to purchase or to designate a purchaser for the selling member's interest at a designated purchase price.  Section 10.5 provides that the closing of a sale of a membership interest must occur no later [earlier?] than 90 days after the giving of written notice of the sale required in section 10.2.  Section 10.7 states:  "Any attempted Disposition of a Membership Interest, or any part

thereof, not in compliance with * * * [article 10] is null and void ab initio."

Dr. Joffe's 1995 Purchases of Additional Interests in the LLC

On September 28, 1995, Laser Centers of America, Inc., sold its 45-percent membership interest in the LLC to Dr. Joffe, and, on December 31, 1995, Dr. McLeod sold his 8-percent membership interest in the LLC to him.  As a result, as of December 31, 1995, Dr. Joffe owned 88 percent, Dr. McKernan owned 10 percent, and Ms. Moore owned 2 percent of the LLC.

The Moore Letter; the Joffe Memorandum

In a handwritten letter dated July 1, 1997, to James P. Kelly (Mr. Kelly), counsel to the LLC during 1996-98, Ms. Moore listed percentage distributions, including an 8-percent share for herself, "should * * * [the LLC] be sold or distributions be made."  In that letter (the Moore letter), Ms. Moore further noted:  "Deborah Moore has 2% originally already.  Also, the agreement for the above percentages in no way interferes with the original LLC percentages."[8]

---

[8]  In substantial part, the Moore letter states:

July 1, 1997

James P. Kelly
200 Galleria Pkwy
Suite 1510
Atlanta, Ga  30339

(continued...)

Sometime between July 1 and late December 1997, Dr. Joffe executed a handwritten, undated memorandum (the Joffe memorandum) to Ms. Moore, in which he states:  "This is to confirm that Debbie Moore will receive 10% (Ten Percent) of the net proceeds of the sale of * * * [the LLC]."

The Kelly Correspondence

During 1997, Mr. Kelly sent three letters (the Kelly correspondence) to Ms. Moore in her capacity as the de facto manager of the LLC.

In the first letter, dated October 17, 1997, Mr. Kelly advised Ms. Moore that the LLC could "lawfully issue 6% of its stock to you under the safe harbor for reasonable compensation to

---

[8](...continued)
Jim:

    I spoke with Dr. Joffe and here are the % distributions for the Surgery Center of Georgia, LLC should the center be sold or distributions be made.  These are % of net profit.

    J. Barry McKernan -- 10%
    J.K. Champion -- 3%
    Robert S. Cowles -- 3%
    Deborah Moore -- 8%
    Ronald Van Tuyl -- 1%
    William S. Armstrong -- 2%
    Rick Hawkins -- 1%

    J. Barry McKernan has originally 10% already in the Surgery Center of Ga and Deborah Moore has 2% originally already.  Also the agreement for the above percentages in no way interferes with the original LLC percentages.  Call for questions.

                    Thanks,
                    Deborah Moore

employees."  The letter also describes the formal requirements needed to effect such an issuance of shares.

The other two letters, both dated October 28, 1997, concern the potential application of Medicare Antikickback laws to proposed physician acquisitions of stock in the LLC.  In one of those letters, Mr. Kelly states his understanding that the LLC "currently is owned by Dr. Joffe (88%) * * * Dr. McKernan (10%) and * * * [Ms. Moore] (2%)".

### The SouthTrust Bank Credit Offering Report and the $50,000 Revolving Note

In connection with a $50,000 loan to the LLC, evidenced by a $50,000 "revolving note" dated March 29, 1999, SouthTrust Bank prepared a "Credit Offering Report" (the SouthTrust Bank credit report), which states:  "The [LLC] was started, according to the tax return, on 5/1/95.  During 1995, two members of the LLC sold their interests to Dr. Joffe who now owns 88%."  That portion of the SouthTrust Bank credit report is date-stamped "Dec-01-98". In another portion of the SouthTrust Bank credit report, entitled "Collateral", the word "Unsecured" appears. The word "Unsecured" is also typed on the revolving note in the  section of the printed form dealing with security agreements.

### The LLC Returns

The initial short year return, Form 1065, U.S. Partnership Return of Income, filed by the LLC for 1995 reflects the 1995 sales by Laser Centers of America, Inc., of its 45-percent

ownership interest and by Dr. McLeod of his 8-percent ownership interest in the LLC to Dr. Joffe. The sales are reflected in footnotes to the Schedules K-1, Partner's Share of Income Credits, Deductions, etc., prepared for Drs. Joffe and McLeod and for Laser Centers of America, Inc.

The returns filed by the LLC for 1996-99 include Schedules K-1 for Drs. Joffe and McKernan and for Ms. Moore (collectively, the LLC members), which reflect percentage profit and loss sharing and capital ownership interests for them of 88, 10, and 2 percent, respectively. The LLC's final return for its short year ending July 31, 2000, reflects those same percentage interests for the LLC members at the beginning of the year, and a zero-percent interest for each at yearend.[9]

The LLC's 1996 and 1997 returns reflect no distributions to the LLC members. The 1998-2000 LLC returns reflect distributions to the LLC members in the following amounts and percentages of total distributions:

| Member | 1998 | | 1999 | | 2000 | |
|--------|--------|------------|---------|------------|----------|------------|
| | Amount | % of Total | Amount | % of Total | Amount | % of Total |
| Dr. Joffe | $40,538 | 67.86 | $268,510 | 63.91 | $978,466 | 68 |
| Dr. McKernan | 12,000 | 20.08 | 96,979 | 23.08 | 287,785 | 20 |
| Ms. Moore | 7,200 | 12.05 | 54,642 | 13.01 | 172,671 | 12 |

Sale of the LLC Membership Interests

On or about November 30, 1999, the LLC, the LLC members, and Surgicoe Corp. (Surgicoe) entered into a "Membership Interest

---

[9] As discussed infra, the LLC members sold their interests in the LLC effective July 28, 2000.

Purchase Agreement" (the Surgicoe purchase agreement) pursuant to which the LLC members agreed to sell their membership interests in the LLC to Surgicoe for a total of $9,988,352, subject to certain adjustments at closing. After those adjustments, the total purchase price was reduced to $9,490,051. The Surgicoe purchase agreement provides that "[t]he Purchase Price shall be allocated as set forth in Schedule 2.2.4." The record contains two such schedules. The first, presumably attached to the agreement, provides: "Consideration to be allocated among Sellers as provided in a closing statement to be executed by Sellers at Closing." The second, presumably executed sometime between the dates of the Surgicoe purchase agreement and the closing, allocates the total purchase price among the LLC members on the following percentage basis: 68 percent to Dr. Joffe, 20 percent to Dr. McKernan, and 12 percent to Ms. Moore. The distribution of the final, adjusted purchase price was as follows:

| Member | Amount | % of Total |
|--------|--------|------------|
| Dr. Joffe | $6,453,234.68 | 68 |
| Dr. McKernan | 1,898,010.20 | 20 |
| Ms. Moore | 1,138,806.12 | 12 |

Surgicoe's purchase of Ms. Moore's interest in the LLC consisted of Ms. Moore's receipt from Surgicoe of $661,774.01 in cash, LLC debt relief apportioned to Ms. Moore of $316,206.24, and a promissory note dated July 28, 2000, in the sum of

$160,825.87.  Also, on that date, Ms. Moore executed (1) a "Certificate of Limited Liability Company Interest in the Surgery Center of Georgia, LLC", in which she certifies to her ownership of a "12% limited liability company interest * * * in [the LLC]," and (2) an "Irrevocable Member Interest Power" pursuant to which she states that she "does hereby sell * * * to [Surgicoe] a 12% interest as a member in [the LLC]" and appoints a named attorney to transfer that interest on the LLC's books.

Assignment and Assumption Agreement

In 2000, in connection with, and sometime before, the July 28, 2000, closing of the sale of the LLC membership interests to Surgicoe, Drs. Joffe and McKernan and Ms. Moore executed an "Assignment and Assumption Agreement * * * made and entered into and effective as of the 1st day of January, 1997" (the assignment and assumption agreement or, sometimes, just the agreement), whereby Dr. Joffe, "in consideration of the continued services of * * * [Dr. McKernan and Ms. Moore] and other good and valuable consideration", transferred a 10-percent membership interest in the LLC to Dr. McKernan and a 10-percent membership interest in the LLC to Ms. Moore.  The last sentence of the agreement, just before the signatures of Drs. Joffe and McKernan and Ms. Moore, reads:  "IN WITNESS WHEREOF, the parties have executed this Agreement under seal to be effective as of the date [January 1, 1997] first above written."  The agreement states that it is "a

Georgia contract and shall be governed by and construed in accordance with Georgia law."

Dr. Joffe, on behalf of himself as manager of the LLC and on behalf of the LLC, executed a "Waiver of Notice and Right to Purchase" (which is attached to the assignment and assumption agreement) whereby he specifically waived (1) the right to receive notice pursuant to section 10.2.1 of the LLC operating agreement of his membership interest dispositions and (2) the LLC's rights, pursuant to section 10.3 of the LLC operating agreement, either to purchase Dr. Joffe's 10-percent membership interests transferred to Dr. McKernan and Ms. Moore or to identify another purchaser thereof.

The Installment Method Reporting Issue

As noted supra, part of the consideration Ms. Moore received for the sale of a 12-percent interest in the LLC to Surgicoe consisted of a promissory note in the sum of $160,825.87. That note provided for 60 consecutive monthly payments of combined principal and interest of $3,358.03, beginning September 1, 2000, and ending August 1, 2005. On their 2000 return, Schedule D, Capital Gains and Losses, petitioners reported as long-term capital gain $631,590 from the July 28, 2000, sale of "partnership interest" and "note payments" in the sum of $16,790.

OPINION

I.  The Section 1031 Issue

    A.  Analysis

As noted supra, the issue before us is whether petitioners held the Clark Hill and Lake Lanier properties "for investment". That depends on their intent or purpose in holding the properties, determined as of the time of the exchange.  E.g., Bolker v. Commissioner, 81 T.C. 782, 804 (1983), affd. 760 F.2d 1039 (9th Cir. 1985).

Petitioners point to their interest in the appreciation potential of the Clark Hill and Lake Lanier properties, both before and after acquisition, and argue:  "If investment intent is one motive for holding * * * property, it is held for investment for purposes of Section 1031."  Petitioners' argument, if carried to its logical extreme, is that the existence of any investment motive in holding a personal residence, no matter how minor a factor in the overall decision to acquire and hold (or simply to hold) the property before its inclusion in an exchange of properties, will render it "property * * * held for investment" with any gain on the exchange eligible for nonrecognition treatment under section 1031.  Petitioners are mistaken.  It is a taxpayer's primary purpose in holding the properties that counts.  Montgomery v. Commissioner, T.C. Memo. 1997-279 ("section 1031 requires that both the property

transferred and the property received in a like-kind exchange be held primarily for productive use in a trade or business, or for investment."), affd. in part and revd. in part on another issue without published opinion 300 F.3d 866 (10th Cir. 1999). Indeed, in Starker v. United States, 602 F.2d 1341, 1350-1351 (9th Cir. 1979), the U.S. Court of Appeals for the Ninth Circuit recognized the longstanding rule that the exclusive use of property by the owner as his residence contradicts any claim by him that the property is held for investment. The court applied the rule specifically to section 1031 exchanges. The court said:

> It has long been the rule that use of property solely as a personal residence is antithetical to its being held for investment. Losses on the sale or exchange of such property cannot be deducted for this reason, despite the general rule that losses from transactions involving * * * investment properties are deductible. A similar rule must obtain in construing the term "held for investment" in section 1031. * * * [Id.; citations omitted.]

This and other courts have reached the same conclusion in the context of deciding whether expenses incurred with respect to a personal residence are deductible under section 212(2) as "expenses paid or incurred * * * for the management, conservation, or maintenance of property held for the production of income". Property held for investment is property held for the production of income within the meaning of section 212. See Newcombe v. Commissioner, 54 T.C. 1298, 1302 (1970) (an expense deduction is justified under section 212(2) only if the property

to which it relates "is 'held for investment,' i.e., for the production of income"); sec. 1.212-1(b), Income Tax Regs.  Thus, both section 1031 and section 212(2) involve the same factual inquiry whether the property in question was held for investment.

As a preliminary matter, we accept as a fact that petitioners hoped that both the Clark Hill and Lake Lanier properties would appreciate.  However, the mere hope or expectation that property may be sold at a gain cannot establish an investment intent if the taxpayer uses the property as a residence.  See Jasionowski v. Commissioner, 66 T.C. 312, 323 (1976) ("if the anticipation of eventually selling the house at a profit were in itself sufficient to establish that the property was held with a profit-making intent, rare indeed would be the homeowner who purchased a home several years ago who could not make the same claim").  Moreover, a taxpayer cannot escape the residential status of property merely by moving out.  In Newcombe v. Commissioner, supra, the taxpayers listed their former residence for sale on or about the day they moved out, December 1, 1965.  They sold the property at a loss on February 1, 1967. The issue in Newcombe relevant to this case was whether, during 1966, the property was held for the production of income (i.e., for investment) so as to entitle the taxpayers to deductions for maintenance expenses under section 212(2).  In denying those deductions we stated:

The taxpayer must * * * be seeking to realize a profit representing postconversion appreciation in the market value of the property. Clearly, where the profit represents only the appreciation which took place during the period of occupancy as a personal residence, it cannot be said that the property was "held for the production of income." * * * [Id. at 1302.]

We added: "The placing of the property on the market for immediate sale, at or shortly after * * * its abandonment as a residence, will ordinarily be strong evidence that a taxpayer is not holding the property for postconversion appreciation in value." Id.[10]

This Court has frequently applied the reasoning of one or both of Jasionowski and Newcombe in rejecting taxpayer arguments that because a second or vacation home was held for appreciation (i.e., investment) the taxpayer was entitled to a deduction, under section 212(2), for expenses incurred to maintain or improve the property. See, e.g., Ray v. Commissioner, T.C. Memo. 1989-628; Houle v. Commissioner, T.C. Memo. 1985-389; Gettler v. Commissioner, T.C. Memo. 1975-87. In both Ray and Houle we denied the deductions on the ground that the taxpayers treated

---

[10] In a concurring opinion, Judge Forrester observed:

The time when the conversion occurred is obviously the key, and any appreciation prior thereto would not have grown while the property was being "held for investment" * * * but while the property was being held as taxpayers' personal residence. [Newcombe v. Commissioner, 54 T.C. 1298, 1304 (1970) (Forrester, J., concurring).]

the houses as a "second home" (Ray) or "second residence" (Houle). In Gettler, we denied the deductions, concluding that "the primary purpose in both acquiring the house and holding on to it was to use it as a vacation home." The cited cases stand for the proposition that the holding of a primary or secondary (e.g., vacation) residence motivated in part by an expectation that the property will appreciate in value is insufficient to justify the classification of that property as property "held for investment" under section 212(2) and, by analogy, section 1031.

Moreover, putting aside petitioners' expectations that both the Clark Hill and Lake Lanier properties would appreciate in value, there is no convincing evidence that the properties were held for the production of income, and there is convincing evidence that petitioners and their families used the properties as vacation retreats. Petitioners made neither the Clark Hill nor Lake Lanier property available for rent. Nor is there any evidence that petitioners held either property primarily for sale at a profit. They did not offer the Clark Hill property for sale until late 1999 when they decided to acquire the more accessible Lake Lanier property. Thereafter, the Clark Hill property was held for immediate sale, not for investment. See Newcombe v. Commissioner, supra at 1302. They did not offer the Lake Lanier property for sale until required to do so by the need for liquidity incident to their divorce. While it is true that Mr.

Moore spent considerable time fixing up and maintaining both properties and petitioners made substantial improvements at the Clark Hill property, those actions are consistent with enjoying the properties as vacation homes. Petitioners did not hold the Clark Hill property out for rent or sale, yet they added a deck and screened-in porch, installed a satellite television receiver, and purchased a television, a VHS recorder, and a new washer and dryer for their use at the property. They replaced furniture and kept a boat on the lake, which they used for boating and fishing. Petitioners added similar electronic equipment to the Lake Lanier house. That house was of some substance, containing five bedrooms and having, among other amenities, five screened-in porches overlooking the lake, a double slip dock, a great room with a stone fireplace, and a full party deck. Surely, that house represented a substantial portion of the purchase price of the Lake Lanier property, yet petitioners made no effort to recover any portion of that investment by renting the house out; indeed, they did not even offer it for rent. Petitioners would have us believe that they used the house only as a caretaker's cottage while awaiting the expected appreciation in the value of the property as a whole. While awaiting that event, however, they purchased a 6- to 8-passenger motorboat to pass the time on the lake. Also inconsistent with their claim that they held the two properties for investment is their failure to claim any tax

deductions for maintenance expenses or depreciation connected with the properties. Also, on their tax returns, they treated all of their interest deductions for 1996-99 and most of those deductions for 2000-02 as home mortgage interest rather than as investment interest.

In short, the evidence overwhelmingly demonstrates that petitioners' primary purpose in acquiring and holding both the Clark Hill and Lake Lanier properties was to enjoy the use of those properties as vacation homes; i.e., as secondary, personal residences. That conclusion is buttressed by Mr. Moore's testimony that, after petitioners' regular weekend use of the Clark Hill property ceased during the last 2 years of their ownership, they allowed it to become "run down" so that it "needed to be looked after or * * * [disposed of]." That lack of upkeep is inconsistent with a professed intention to protect their investment in and maximize their profit on the sale of the property but consistent with an attitude that continued upkeep and maintenance were warranted only in connection with petitioners' regular, personal use of the property.

The caselaw upon which petitioners principally rely is inapposite. In Vandeyacht v. Commissioner, T.C. Memo. 1994-148, we sustained the taxpayers' deductions for expenses associated with two oceanfront recreational properties. In that case, however, the taxpayers never occupied the properties, a

condominium and a house, nor used them for personal purposes; and, although the taxpayers' children and friends stayed in both properties, they paid fair market rent to the taxpayers.

In Hambleton v. Commissioner, T.C. Memo. 1982-234, we denied deductions for expenses relating to farming activities on a 110-acre tract of farmland because we found that the taxpayers lacked the requisite profit motive under section 183. We found, however: "Although * * * [the taxpayers] used approximately one acre surrounding the house for personal use, * * * [the taxpayers'] principal motivation in purchasing the 110 acre farm was to realize a profit through appreciation in the value of the land." We denied the deductions only because the taxpayers were unable to explain how any of the expenses were "ordinary and necessary to the holding of the property as an investment." The taxpayers' circumstances in Hambleton are readily distinguishable from petitioners' circumstances wherein the properties in question are not obviously divisible into residential and nonresidential portions and, as far as we can tell, were used entirely and exclusively as weekend vacation retreats.

Lastly, neither Holmes v. Commissioner, 184 F.3d 536 (6th Cir. 1999), revg., vacating, and remanding T.C. Memo. 1997-401, nor Frazier v. Commissioner, T.C. Memo. 1985-61, addresses the issue of whether a personal residence that the taxpayers use exclusively for recreational purposes can constitute property

held for investment. Rather, the issue in both cases, decided in the taxpayers' favor, was whether incidental recreational or residential use by the taxpayers or family members of property primarily used by the taxpayers for commercial farming or fishing (or whether the personal enjoyment they derived from those primary usage activities) negated the taxpayers' profit motive for engaging in those activities.

B. Conclusion

Neither the Clark Hill nor Lake Lanier property constituted property held for investment for purposes of section 1031(a). Therefore, petitioners' disposition of the former and acquisition of the latter did not qualify as a tax-free "like-kind" exchange of properties under section 1031.

II. The Membership Interest Acquisition Issue

A. Introduction

Our resolution of this issue will determine whether petitioners are required to report, as Ms. Moore's distributable share, 2 percent of the LLC's income for the years in issue, as alleged by petitioners, or 12 percent of that income, as alleged by respondent.

B. Petitioners' Position

Petitioners acknowledge that Dr. Joffe transferred a 10-percent membership interest in the LLC to Ms. Moore, which, together with his transfer of another 10-percent interest to Dr.

McKernan, reduced his percentage membership interest in the LLC from 88 to 68 percent and increased Ms. Moore's percentage membership interest from 2 to 12 percent. Petitioners argue, however, that those transfers occurred in July 2000 upon the execution of the assignment and assumption agreement.

Petitioners also argue that the 1998-2000 distributions from the LLC to its members in amounts either precisely or closely reflecting a 68-20-12-percent profit split among Dr. Joffe, Dr. McKernan, and Ms. Moore, respectively (referred to by petitioners' counsel, on brief, as "disproportionate distributions"), did not reflect a shift in the membership interests among those three individuals before July 2000, but, instead, reflected an informal agreement among them that Dr. McKernan and Ms. Moore should be compensated by those distributions for the use of LLC profits and the pledge of LLC assets to discharge Dr. Joffe's debt to the creditors of his failed surgery center in Cincinnati, Ohio. In effect, petitioners argue that, to the extent the 1998-2000 distributions to Ms. Moore and Dr. McKernan exceeded 2 percent and 10 percent, respectively, of the LLC's current and accumulated profits, they represented a return of capital.

In support of their position, petitioners rely primarily upon: (1) the Moore letter, which speaks of distribution percentages and not shares of income, (2) the Joffe memorandum,

confirming his agreement to give Ms. Moore "10% of the net proceeds upon the sale of * * * [the LLC]", but, petitioners argue, not an additional 10-percent share of annual income, (3) the fact that the Schedules K-1 attached to the 1997-2000 LLC partnership returns all state that the three members share LLC profits and losses in a ratio of 88 percent for Dr. Joffe, 10 percent for Dr. McKernan, and 2 percent for Ms. Moore, (4) the Kelly correspondence, in which Mr. Kelly expressed his understanding, presumably obtained from the Moore letter and, perhaps, from other conversations or communications with Ms. Moore, that the foregoing 88-10-2-percent LLC ownership split was still in effect, (5) the LLC members' failure to satisfy the requirements of the LLC operating agreement governing dispositions of membership interests, and (6) the SouthTrust Bank credit report, which, petitioners allege, indicates that, as late as December 1, 1998, SouthTrust Bank believed that Dr. Joffe still owned 88 percent of the LLC. Petitioners state: "The documentary evidence of the bank loan * * * confirms that * * * [Dr. Joffe] pledged * * * [his 88 percent] membership interest to SouthTrust Bank in March 1999, [the date of the loan] over two years after respondent claims he transferred 10% of that interest [to Ms. Moore]."

Petitioners view the language in the assignment and assumption agreement creating an effective date "as of" January

1, 1997, (the effective date provision) as an improper and ineffective "backdating" of that agreement or, alternatively, as "a draftsman's error that can be reformed under Georgia law"; i.e., as a mutual mistake correctable by the introduction of parol evidence.

C. Respondent's Position

Respondent argues that the assignment and assumption agreement was the means of "formalizing" Dr. Joffe's transfer of 10-percent membership interests in the LLC to Dr. McKernan and Ms. Moore effective January 1, 1997, and that "[f]rom that time forward" the division of ownership among the LLC members was 68 percent for Dr. Joffe, 20 percent for Dr. McKernan, and 12 percent for Ms. Moore. In support of his position, respondent argues that the 1998-2000 cash distributions to those three individuals "in the approximate ratio of 68/20/12 * * * demonstrates that the LLC made its cash distributions based upon the members' interests, as modified in 1997."

Respondent also seeks to refute all of petitioners' attacks on the effective date provision. He acknowledges the failure to follow the procedural requirements set forth in the LLC operating agreement for transfers of membership interests, but he points out that those requirements were specifically waived by Dr. Joffe, as manager of the LLC, and by the parties to the assignment and assumption agreement by their entering into that

agreement, an action that amounted to their consent to the waiver of those requirements.   He argues that the assignment and assumption agreement was not "backdated", i.e., it "was not a document * * * [attempting] to change the past or * * * to misrepresent the past", but, rather, "was * * * created to formalize informal transactions that had occurred in the past". He also argues that the effective date provision is not an example of mutual mistake that would otherwise permit petitioners to introduce parol evidence to establish the actual effective date of Dr. Joffe's transfer of a 10-percent interest in the LLC to Ms. Moore; and he argues that the LLC's 1998-2000 increased distributions to Dr. McKernan and Ms. Moore were not simply a monetary quid pro quo for the use of LLC assets as collateral for the discharge of Dr. Joffe's bank debt related to his failed Cincinnati Surgery Center.  Rather, he argues that those distributions corroborated a prior increase in the LLC membership interests of those individuals.

   D.  Analysis

      1.  Introduction

Although each party can point to evidence supporting that party's view regarding the date upon which Ms. Moore's membership interest in the LLC increased from 2 percent to 12 percent, we find that a preponderance of the evidence supports respondent's

view that Ms. Moore owned a 12-percent membership interest in the LLC during the years in issue, 1999 and 2000.

### 2. The Assignment and Assumption Agreement

The assignment and assumption agreement does not set forth an execution date. Rather, it states that it "is made and entered into and effective as of the 1st day of January, 1997 by and among * * * [the LLC members]".

Petitioners argue that the execution date of the agreement (alleged by petitioners, without dispute by respondent, to be sometime during July 2000, when the agreement was entered into in connection with the closing of the sale of the membership interests in the LLC to Surgicoe) is its effective date. They cite Georgia caselaw, which permits the introduction of parol evidence to establish the actual date of execution, and they rely upon both Georgia statutory law and caselaw, which permit equitable reformation of a contract in order to conform with the true intent of the parties where there has been a mutual mistake in the drafting of the contract. Respondent disputes the applicability of both lines of authority.

### a. Enforceability of the Effective Date Provision

### (1) Governing Principles of Georgia Law

As noted supra, the assignment and assumption agreement specifically states that it is to be "governed by and construed in accordance with Georgia law." Under Georgia law, it is clear

that the parties to a contract can give the contract retroactive effect. See Am. Cyanamid Co. v. Ring, 286 S.E.2d 1, 3 (Ga. 1982). In that case, the Supreme Court of Georgia was called upon to determine the effective date of a contract executed by the parties sometime after July 1, 1975, the first sentence of which read: "This contract entered into as of July 1, 1975", and the last sentence of which read: "In witness whereof, the parties hereto have executed this contract as of the day and year first above written." On the basis of those two sentences (which are virtually identical, both in language and in contract placement, to the corresponding sentences in the assignment and assumption agreement), the court held that the effective date of the contract was July 1, 1975. In reaching that conclusion, the court observed that "the effective date of a contract is not the date of execution where the contract expressly states that its terms are to take effect at an earlier date." Id. at 674; see also Goldstein v. Ipswich Hosiery Co., 122 S.E.2d 339, 345 (Ga. Ct. App. 1961) ("It is elemental that contracting parties may agree to give retroactive effect, between themselves, to their contracts as they may see fit."); 2 Williston on Contracts, sec. 6:60 (4th ed. 1991) ("it seems clear that, where the parties themselves agree that a contract between them should be given effect as of a specified date, absent the intervention of third party rights, there is no sound reason why that agreement should

not be given effect"). Williston cites both <u>Am. Cyanamid</u> and <u>Goldstein</u> as the embodiment of Georgia precedent in support of the quoted statement.

Petitioners attempt to discredit the effective date language of the agreement, alleging that it is inconsistent with Dr. Joffe's and Ms. Moore's actions during 1997-2000, which, they argue, demonstrate an intent to transfer a 10-percent membership interest in the LLC from Dr. Joffe to Ms. Moore no earlier than July 2000. Under Georgia law, however: "Where the terms of a written contract are clear and unambiguous, the court will look to the contract alone to find the intention of the parties." <u>Health Serv. Ctrs., Inc. v. Boddy</u>, 359 S.E.2d 659, 661 (Ga. 1987).

### (2) The Effective Date Provision Is Not a Prohibited Backdating of the Assignment and Assumption Agreement

We do not view the effective date provision as an attempt to backdate the assignment and assumption agreement in order to retroactively obtain an unwarranted tax benefit. Rather, we consider its purpose to have been to reduce to writing a prior oral understanding among the parties. As the cases petitioners cite make clear, "backdating" generally involves an effort to make it appear that the document in question was executed on a date prior to its actual execution date; i.e., there is an effort to mislead the reader. That is not true of the assignment and

assumption agreement, where the "effective as of" phrase makes clear that the intended effective date differs from the execution date.

The parties to the agreement were operating at arm's length. A retroactive increase in Dr. McKernan's and Ms. Moore's share of LLC profits would have necessarily resulted in a retroactive decrease in Dr. Joffe's share of those profits. Thus, aside from possible tax rate differentials among the three individuals (unsupported by any evidence in the record), the respondent is indifferent as regards the respective profit shares of each. The cases petitioners cite do not involve parties dealing at arm's length or IRS indifference to their actions. In Georgiou v. Commissioner, T.C. Memo. 1995-546, we rejected taxpayer attempts to rely upon (1) documents dated 1 to 3 years before their actual execution dates in order to establish beneficial stock ownership, during the preexecution years, of a corporation the losses of which would then have been available in consolidation to offset the taxpayer's income in those years, and (2) corporate minutes, a security agreement, promissory notes, and altered accounting records, all dated before, but executed or prepared after, certain advances by a corporation to the taxpayer shareholder, in order to show that the advances were loans rather than constructive dividends. Similarly, each of the other cases petitioners cite in support of their argument that courts

uniformly disregard (and may even find fraudulent) backdated documents involves taxpayer efforts to use those documents solely in order to achieve a tax result dependent upon timely action by the taxpayer, where the time to act had already passed.  See e.g., United States v. Whistler, 139 Fed. Appx. 1 (9th Cir. 2005); Dobrich v. Commissioner, T.C. Memo. 1997-477, supplemented T.C. Memo. 1998-39, affd. without published opinion 188 F.3d 512 (9th Cir. 1999); Medieval Attractions N.V. v. Commissioner, T.C. Memo. 1996-455.  The circumstances described in the cases cited by petitioners are factually distinguishable from the circumstances surrounding the execution of the assignment and assumption agreement.  Those cases are, therefore, inapposite.[11]

(3) The Effective Date Included in the Assignment and Assumption Agreement Was Not a Mutual Mistake Reformable by Parol Evidence Under Georgia Law

As noted supra, petitioners also argue, and respondent disputes, that the specification in the assignment and assumption agreement of a January 1, 1997, effective date was a mistake that may be reformed under Georgia Law.  Although we agree with petitioners that the resolution of the issue is governed by Georgia law, see, e.g., Estate of Holland v. Commissioner, T.C.

---

[11]  Also inapposite are the cases petitioners cite for the proposition that Georgia's parol evidence rule does not preclude evidence of the actual execution date of a document.  See, e.g., Smith v. Smith, 156 S.E.2d 901, 902 (Ga. 1967); Irwin v. Dailey, 118 S.E.2d 827, 829-830 (Ga. 1961).  The issue in this case is not the execution date of the assignment and assumption agreement.

Memo. 1997-302 (issue of whether decedent's conveyance with respect to her Atlanta, Georgia, residence to her children could be reformed to carry out her actual intention to convey a life estate rather than the fee simple interest mistakenly specified in the conveyance governed by Georgia law), we disagree that the effective date provision was a drafting error or mistake subject to reformation under Georgia law.

Ga. Code Ann. sec. 23-2-21 (1982) provides as follows:

What mistakes relievable in equity; power to relieve to be exercised cautiously.

 (a) A mistake relievable in equity is some unintentional act, omission, or error arising from ignorance, surprise, imposition, or misplaced confidence.

 (b) Mistakes may be either of law or of fact.

 (c) The power to relieve mistakes shall be exercised with caution; to justify it, the evidence shall be clear, unequivocal, and decisive as to the mistake.

Ga. Code Ann. sec. 23-2-31 (1982) provides, in pertinent part:  "Equity will not reform a written contract unless the mistake is shown to be the mistake of both parties".  See also Cox v. Smith, 260 S.E.2d 310, 312-313 (Ga. 1979) ("A 'mutual mistake' in an action for reformation means one in which both parties had agreed on the terms of the contract, but by mistake of the scrivener the true terms of the agreement were not set forth."); Prince v. Friedman, 42 S.E.2d 434, 436 (Ga. 1947) ("jurisdiction [to reform a contract in equity for mutual

mistake] will always be cautiously exercised, and to justify it the evidence must be clear, unequivocal, and decisive.").

In this case, there is not "clear, unequivocal, and decisive" evidence of mutual mistake as required by Georgia law. The assignment and assumption agreement plainly states that it is to be effective as of January 1, 1997. It is a brief (two-page) agreement, which makes it unlikely that Ms. Moore was distracted by excessive verbiage so that she failed to notice the effective date provision in the very first sentence of the agreement.

Dr. Joffe testified that he and Ms. Moore agreed to his transfer of a 10-percent membership interest in the LLC to her in 1997 and that, beginning in 1997, the LLC distributions would reflect that shift in membership interest. T. Mills Fleming (Mr. Fleming), an attorney representing Ms. Moore and Dr. McKernan in connection with the sale of their membership interests to Surgicoe, testified that the assignment and assumption agreement was drafted in order to verify to Surgicoe, in writing, that the proceeds from the sale of the LLC membership interests should be allocated on a 68-20-12-percent basis among Drs. Joffe and McKernan and Ms. Moore, respectively. He further testified that the January 1, 1997, effective date was inserted "because that's what the parties represented was the effective date of the transfer of those interests from 88-10-2 to the 68-20-12." Kenneth R. Schwartz (Mr. Schwartz), at the time an associate at

Mr. Fleming's firm, worked with Mr. Fleming in his representation of Ms. Moore and Dr. McKernan. He wrote the initial draft of the assignment and assumption agreement. He testified that he and Mr. Fleming assumed that the January 1, 1997, effective date reflected "the way they [Drs. Joffe and McKernan and Ms. Moore] had been treating it"; i.e., their respective membership interests. The testimony of Dr. Joffe, Mr. Fleming, and Mr. Schwartz constitutes evidence that there was an understanding among the members of the LLC (and certainly on Dr. Joffe's part) that the purpose and effect of the assignment and assumption agreement was to formalize their prior oral agreement to have Dr. Joffe transfer 10-percent membership interests to Dr. McKernan and Ms. Moore, effective January 1, 1997.

Dr. Joffe's 1997-2000 Federal income tax returns would reflect whether he respected the LLC Schedule K-1 attributions to him, for those years, of an 88-percent membership interest in the LLC. Respondent argues that petitioners could have subpoenaed Dr. Joffe and required him to produce his tax returns. Indeed, Dr. Joffe did testify, as respondent's witness, and was subject to cross-examination by petitioners' counsel. Petitioners asked him no questions about his 1997-2000 returns. Petitioners' failure to question Dr. Joffe with respect to his returns or require him to produce those returns raises an inference that they would reflect Dr. Joffe's belief that he, in fact, possessed

a 68-percent membership interest as of January 1, 1997.  See

Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165

(1946) ("the failure of a party to introduce evidence * * *

which, if true, would be favorable to him, gives rise to the

presumption that if produced it would be unfavorable"), affd. 162

F.2d 513 (10th Cir. 1947).

Neither the Moore letter nor the Joffe memorandum provides

convincing evidence that a mutual mistake resulted in the

assignment and assumption agreement's recitation of an effective

date of January 1, 1997, for the transfer of interests in the LLC

by Dr. Joffe to Ms. Moore and Dr. McKernan.  Both documents

postdate January 1, 1997.  Ms. Moore testified that the Moore

letter related to a plan that was never implemented to distribute

percentages to other physicians that had been loyal and faithful

to the LLC.  The letter is confusing in that it speaks in terms

of percentage distributions "should the * * * [LLC] be sold or

distributions be made".  (Emphasis added.)  The letter does not

answer the question:  Distributions of what?  Sale proceeds?

Annual profits?  The percentages are identified as percentages of

net profit.  The letter was written to a lawyer asking for advice

on how to accomplish a change to the status quo.  Ms. Moore may

have in part been concerned with keeping the 10-percent interest

in profits that Dr. Joffe testified she was to get beginning in

1997.  The Joffe memorandum can be interpreted as confirming a

prior agreement that Dr. Joffe would give Ms. Moore an additional 10 percent of the net proceeds of any sale of the LLC, and the failure to reference interim distributions (in addition to sale proceeds) could have been an oversight or simply poor draftsmanship by the doctor. Neither alone nor together are the two documents inconsistent with the conclusion, supported by both the assignment and assumption agreement and the LLC's 1998-2000 distributions to Dr. Joffe, Dr. McKernan, and Ms. Moore (discussed infra) that, before the end of 1997, those three individuals agreed to Dr. Joffe's transfer of an additional 10-percent LLC membership interest to each of the other two, and that those transfers were to be effective as of January 1, 1997; i.e., they would result in a 10-percent increase for Dr. McKernan and Ms. Moore and a 20-percent decrease for Dr. Joffe in their respective shares of LLC profit (or loss) for the entire year. Such an agreement could have been finalized at any time during 1997, not necessarily on or before January 1 of that year as petitioners suggest. We find that the Moore letter and the Joffe memorandum fail to provide "clear, unequivocal, and decisive" evidence of mutual mistake.

Nor do the Schedules K-1 attached to the LLC's 1997-2000 returns, the Kelly correspondence, or the SouthTrust Bank credit report provide such evidence.

John Carpentier (Mr. Carpentier) of the accounting firm of Tarpley & Underwood, P.C. the firm that prepared the LLC's 1996-2000 Federal income tax returns, testified that he prepared the 1996 return and reviewed the subsequent returns. Because no one contacted him to say that the percentage membership interests of the three members changed after 1996, the firm continued in the post-1996 returns to reflect the 88-10-2-percent membership interest allocation on the Schedules K-1 issued to Drs. Joffe and McKernan and Ms. Moore. Mr. Kelly (the lawyer), in his October 28, 1997, letter to Ms. Moore, states: "We understand that [the LLC is owned by Drs. Joffe and McKernan and Ms. Moore on an 88-10-2 percentage basis]." The fact that neither Mr. Carpentier nor Mr. Kelly was made aware of any agreement that might have altered those percentage interests is not evidence that that agreement did not exist, only that it was not communicated to those individuals.

Similarly, the December 1998 SouthTrust Bank credit report supporting the $50,000 March 1999 loan to the LLC determined that Dr. Joffe still owned 88 percent of the LLC, apparently on the basis of the LLC's 1995 return, which describes the 1995 member sales that increased Dr. Joffe's membership interest in the LLC to 88 percent. There is no evidence that Dr. Joffe told

SouthTrust Bank in 1998 that he continued to hold an 88- percent membership interest.[12]

In each instance petitioners cited, the reference to a continuing 88-10-2-percent division of the LLC membership interests is simply based upon the lack of any information to the contrary. None of the documents petitioners cite provides "clear, unequivocal, and decisive evidence" that Dr. Joffe and Ms. Moore had not agreed to the transfer of a 10-percent membership interest in the LLC from the former to the latter as of January 1, 1997.

Lastly, the LLC's 1998-2000 distributions are consistent with an agreement, at least as early as 1998, to allocate the LLC membership interests on a 68-20-12-percent basis among Drs. Joffe and McKernan and Ms. Moore, respectively. Petitioners argue that those so-called disproportionate distributions (disproportionate to the 88-10-2-percent split alleged by petitioners) were merely a means of compensating Dr. McKernan and Ms. Moore for the pledging of LLC assets and the use of LLC funds to discharge debts incurred by Dr. Joffe's failed Cincinnati Surgery Center and were not the result of a prior transfer of 10-percent LLC

---

[12] Neither is there any support in the record for petitioners' argument that Dr. Joffe pledged an 88-percent interest in the LLC as security for the March 1999 loan to the LLC. As noted supra, both the note Dr. Joffe executed on behalf of the LLC and the SouthTrust Bank credit report (under the heading "Collateral") describe the loan as "Unsecured".

membership interests from Dr. Joffe to Dr. McKernan and Ms.

Moore.  Petitioners cite section 8.5 of the LLC operating

agreement as permitting interim distributions not in accordance

with the recipients' membership interests.  In further support of

their argument, petitioners rely on the following language taken

from a footnote to the LLC's financial statements for 1997 and

1998, which were reviewed by the LLC's outside accountants

Tarpley & Underwood, P.C.:

> as a part of * * * [a] refinancing [of long-term debt],
> one of the members [Dr. Joffe] refinanced other debt,
> on which the member and the * * * [LLC] are
> contingently liable in the amount of $3,054,972 at
> December 31, 1998.  Principal and interest payments may
> be paid personally by the member by distributions from
> the * * * [LLC].  Proportionate cash distributions will
> be made to other members of the * * * [LLC].

We do not agree with petitioners that the foregoing

accountant's language describes a disproportionate increase in

the distributions to Dr. McKernan and Ms. Moore and a

corresponding disproportionate decrease in the distributions to

Dr. Joffe.  In fact, the reference to "proportionate cash

distributions * * * to other members" is consistent with the

notion that Dr. McKernan and Ms. Moore were to receive interim

distributions proportionate (not disproportionate) to their

membership interests.[13]  Moreover, section 8.5 of the LLC

---

[13]  Assuming arguendo that the enhanced financial benefit to Dr. McKernan and Ms. Moore was motivated by the LLC's potential responsibility for Dr. Joffe's personal debt, as argued by

(continued...)

operating agreement is consistent with a general requirement that interim distributions to members of the LLC be proportionate to their membership interests.  The operative language provides as follows:

> Members * * * may make Distributions to the Members in accordance with their Membership Interests.  Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Manager.

A straightforward reading of the foregoing language leads to the conclusion that the parenthetical clause modifies the word "Property", not the word "distributions".  Finally, accepting for the sake of argument petitioners' logic for disproportionate distributions among the members of the LLC, they have failed to show us how they arrived at an approximately 68-20-12 split that,

---

[13](...continued)
petitioners, rather than by "the past and future administrative services of McKernan and Moore on behalf of the * * * [LLC]", as stated in the assignment and assumption agreement, it makes more sense from an economic self-interest standpoint for Dr. McKernan and Ms. Moore to have demanded increased membership interests rather than so-called disproportionate distributions from the LLC because the latter were likely to result in a return of capital and, possibly, a negative capital account for either or both. The resulting potential economic detriment of such an arrangement is, in fact, illustrated by the 2000 sale of membership interests in the LLC to Surgicoe.  Sec. 3.5 of the Surgicoe purchase agreement specifically requires that "the Sellers' interests * * * [be] fully paid and assessable", which, in effect, supersedes sec. 7.6 of the LLC operating agreement to the extent that it provides that that agreement "shall not be construed as creating a [capital account] deficit restoration obligation".  See also sec. 12.3 of the LLC operating agreement, which limits the distribution of assets, on the dissolution of the LLC, "to Members in accordance with positive Capital Account balances".

coincidentally, mirrored the split under the assignment and assumption agreement. Therefore, we view the LLC's 1998-2000 distributions in relative percentages approximating 68, 20, and 12 among Drs. Joffe and McKernan and Ms. Moore, respectively, as strong evidence that those distributions reflected a 68-20-12-percent membership interest allocation in the LLC among those individuals during those years.

In the light of the foregoing, we find no basis for concluding that the effective date provision of the assignment and assumption agreement was caused by a mutual mistake reformable by parol evidence under Georgia law.

      b. <u>Dr. Joffe's Transfers of Membership Interests Under the Assignment and Assumption Agreement Were Not Void Because of Noncompliance With Article 10 of the LLC Operating Agreement</u>

Petitioners argue that, because Dr. Joffe's membership interest transfers to Dr. McKernan and Ms. Moore failed to comply with the requirements of article 10 of the LLC operating agreement, governing dispositions of membership interests, and article 6, governing meetings of LLC members, his purported transfer to Ms. Moore, as of January 1, 1997, "is null and void ab initio" pursuant to article 10.7. Petitioners' argument ignores established principles of Georgia law, which provide that contractual provisions may be waived by the mutual consent of the parties to the contract, and that such consent may be established

by the parties' course of conduct.[14]  See, e.g., <u>Handex of Fla.,
Inc. v. Chatham County</u>, 602 S.E.2d 660, 664 (Ga. Ct. App. 2004)
("While a distinct stipulation in a contract may be waived by the
conduct of the parties, it must appear that it was the intention
of the parties to treat such stipulation as no longer binding.");
<u>Shalom Farms, Inc. v. Columbus Bank & Trust Co.</u>, 312 S.E.2d 138,
141 (Ga. Ct. App. 1983) ("To establish the existence of a quasi
new agreement would require * * * a showing of mutual * * *
intention to vary the terms of the original contract.  * * *
Such a showing may be implied from the parties' conduct").

The parties to the assignment and assumption agreement,
constituting the entire membership of the LLC, voluntarily
executed that agreement in the absence of formal notice to the
manager of intent to dispose of membership interests and without
affording the LLC its right of prior purchase.  See articles 10.2
and 10.3 of the LLC operating agreement.  Moreover, Dr. Joffe, in
his capacity as manager of the LLC, executed a "Waiver of Notice
and Right to Purchase" (attached to the assignment and assumption
agreement) whereby the LLC formally waived its rights under
articles 10.2 and 10.3.  We view those actions as constituting

_____

[14]  The preamble to the LLC operating agreement states that
it "is entered into by and among the Company and the persons
executing this Agreement as Members".  Therefore, it is in the
nature of a contract the parties to which are the LLC and its
members.  See <u>Kinkle v. R.D.C., L.L.C.</u>, 889 So. 2d 405, 409 (La.
Ct. App. 2004) ("An operating agreement is contractual in nature;
thus, it * * * is interpreted pursuant to contract law.").

mutual consent or agreement, by the parties to the assignment and assumption agreement, to waive the requirements of article 10 of the LLC operating agreement.[15]  Therefore, the sales of LLC membership interests pursuant to the assignment and assumption agreement were not void by reason of noncompliance with the aforesaid article 10.[16]

E.  Conclusion

Ms. Moore owned a 12-percent membership interest in the LLC during the years at issue (1999 and 2000).

III.  The Installment Method Reporting Issue

A.  Analysis

Respondent argues that petitioners are not entitled to report their income from the sale of Ms. Moore's membership interest in the LLC under the installment method of section 453. Respondent asserts that petitioners opted out of the installment method, pursuant to section 453(d), "by reporting on their original return all of the income they believed they received in

---

[15]  The waiver of articles 10.2 and 10.3 of the LLC operating agreement necessarily rendered the balance of the otherwise applicable provisions of article 10 inoperative.

[16]  Petitioners' argument that Dr. Joffe's purported transfers of LLC membership interests as of Jan. 1, 1997, were invalid does not extend to the validity of those same transfers as of July 2000.  There is no evidence that Dr. Joffe transferred membership interests to Dr. McKernan and Ms. Moore other than by means of the assignment and assumption agreement.  Therefore, petitioners' argument that that agreement was void ab initio is obviously inconsistent with their admission that the transfers occurred in July 2000 pursuant to that same agreement.

connection with the sale and not filing a Form 6252 [Installment Sale Income] with their original return."

Section 453(d) permits a taxpayer who has made an installment sale to elect out of the installment method of accounting, which, absent the election, would apply to the sale pursuant to section 453(a).  Section 15A.453-1(d)(3)(i), Temporary Income Tax Regs., 46 Fed. Reg. 10718 (Feb. 4, 1981), provides, in pertinent part:

> A taxpayer who reports an amount realized equal to the selling price including the full face amount of any installment obligation on the tax return filed for the taxable year in which the installment sale occurs will be considered to have made an effective election [out of the installment method] * * *

On their 2000 return, Schedule D, petitioners reported two items of long-term capital gain:  $631,590 described as "partnership interest" and $16,790 described as "note payments". Both items were reported as gross sale price offset by zero basis.  The $631,590 approximates the $661,774.01 cash payment from Surgicoe to Ms. Moore at the closing of the sale of her LLC membership interest to Surgicoe that was specified in a "Disbursement Authorization" dated July 29, 2000, and signed by the parties to the Surgicoe purchase agreement.[17]  The $16,790 equals five payments of $3,358.03, the amount of the monthly

--------

[17]  There is no explanation of the discrepancy between the amount of the cash payment provided in the disbursement authorization and the amount petitioners reported.

payments, to be made the first of each month, beginning September 1, 2000, specified in Surgicoe's promissory note to Ms. Moore.[18] Therefore, it is clear that petitioners reported, on their 2000 return, no more than the cash payments received in 2000, not the full amount of the selling price for Ms. Moore's LLC membership interest ($1,138,806.12) and not the full face amount of the Surgicoe promissory note ($160,825.87). Under those circumstances we find that petitioners did not elect out of the installment method of reporting the income from Surgicoe's promissory note. See Estate of Wilkinson v. Commissioner, T.C. Memo. 1993-463 ("The only method for electing out of the installment method * * * is for taxpayers to report the full amount of the sales price and the full amount of the income associated with installment sales on timely filed tax returns for the year of the sales.").[19]

---

[18] Assuming the monthly payments commenced on Sept. 1, 2000, as specified in Surgicoe's promissory note, the fifth payment would have been due Jan. 1, 2001. It appears, however, that that payment was included in petitioners' 2000 return.

[19] Respondent cites petitioners' failure to file a Form 6252, Installment Sale Income, as conclusive evidence that "petitioners have not demonstrated that they intended to report their transaction under the installment method." Respondent does not suggest that petitioners' failure to file that form constituted a procedural defect sufficient in itself to bar petitioners' use of the installment method, and, indeed, there is no support in either sec. 453 or the regulations thereunder for that position. As we conclude herein, it is a taxpayer's reporting of the full amount of the income derived from an installment sale (not the taxpayer's failure to file a Form 6252)
(continued...)

B.  Conclusion

Petitioners did not elect out of the installment method in connection with Ms. Moore's 2000 installment sale of her LLC membership interest.

IV.  Conclusion

To reflect the foregoing,

Decision will be entered
under Rule 155.

_____

[19](...continued)
that is determinative of an intent to elect out of the installment method.